**MEDENICA LAW PLLC**
Olivera Medenica (OMedenica@Medenicalaw.com)
3 Columbus Circle, 15th Floor
New York, New York 10019
Tel: (212) 785-0070

*Attorneys for Plaintiff David Gamble*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID GAMBLE,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>CURVED LIGHT PRODUCTIONS LLC d/b/a STARTALK, NEIL DEGRASSE TYSON, HELEN MATSOS, and JOHN DOES 1 through 10<br><br>　　　　　　　Defendants. | Civil Action No.　17-cv-6635<br><br>**COMPLAINT**<br><br>*Jury Trial Demanded* |

Plaintiff David Gamble ("Gamble"), by his attorneys, Medenica Law PLLC, for his Complaint (the "Complaint") against Defendants Curved Light Productions LLC d/b/a StarTalk, Neil Degrasse Tyson,  Helen Matsos, and John Does 1-10 herein alleges as follows:

**NATURE AND BASIS OF THE ACTION**

1.　　This action arises out of Defendants' deliberate and brazen use of Plaintiff's photographs for Defendants' personal gain, without compensation or authorship credit to Plaintiff. Plaintiff has spent a lifetime working as a professional photographer, earning a living from his craft, and receiving wide acclaim and recognition for his artistry.  The underlying facts of this case are simple: Plaintiff's work was used by Defendants without compensation, without permission,

1

and without proper authorship credit in social media, hard copy prints, posters and even highway billboards. This case is also about Plaintiff's systematic exclusion from a company that he co-founded, to result in the forced sale of his equity interest at a fraction of its value based upon misrepresentations by Defendants.

2.     As a result of Defendants' actions, and as described more fully below, Plaintiff brings this action for copyright infringement, secondary copyright infringement, contributory copyright infringement, removal of copyright management information, breach of fiduciary duty, and fraudulent concealment by fiduciary.

## PARTIES

3.     Plaintiff David Gamble is a world renowned, award winning photographer and artist, born in London, who has been working as an independent artist and freelance photographer for over four decades. He is a United States citizen, and currently resides in New Orleans, Louisiana.

4.     Curved Light Productions LLC ("CLP") is a New York Limited Liability Company with a principal place of business at 88 North Main Street, Southampton, New York 11968. CLP is a theatrical production company that produces a radio show entitled "StartTalk" featuring Defendant Neal Degrasse Tyson ("Tyson"). Upon information and belief, CLP has currently two members: Tyson and Helen Matsos.

5.     Upon information and belief, Tyson is an individual who is a United States citizen and who resides in New York, New York. Upon information and belief, Tyson is the Director of the Hayden Planetarium, an astrophysicist, author, television and radio personality, and a public speaker on various science related subject matters.

2

6.      Upon information and belief, Helen Matsos ("Matsos") is an individual who is a United States citizen and who resides in New York, New York.

7.      Plaintiff does not know the true name and capacity of Defendants John Does 1-10 and therefore sues these defendants by such fictitious name.  Plaintiff will amend the Complaint to allege the true name and capacity of John Does 1-10 when ascertained.  Upon information and belief, Defendants John Does 1-10 are individuals or entities that are acting in concert with, or at the direction of Defendant CLP and/or Defendant Tyson.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331, 1332 and 1338; and supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. §1367.

9.      Jurisdiction is also founded upon 28 U.S.C. §1332 because Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of costs, interest and attorneys' fees.

10.      This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants either reside in New York and/or engage in business in the State of New York either directly or through their agents, and the causes of action alleged herein arise out of Defendants' transactions of business in New York, the commission of tortious acts in New York, and/or the commission of tortious acts outside of New York that have caused injury within the state of New York.

11.      Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants reside in the district in which this Court sits, and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### 1)      David Gamble: Background as a Professional Photographer

12.      Gamble is a professional photographer and artist who has spent the better part of his life practicing and honing his craft.  Since the mid-1970s, his passion for photography has led him all across the globe where he has worked on commercial assignments for various notable publications such as The New Yorker, Elle, Time-Life, Observer Magazine, The Independent, The Sunday Times, Telegraph, Conde Nast Traveller, Life Magazine, Fortune, Paris Match and Newsweek, among many others. He has also worked as a commercial photographer and photography director for national advertising campaigns such as Levi's Jeans, the Cancer Research Foundation, Infinity/CBS Corp. and Wedgewood, among many others.  His work has resulted in numerous prestigious awards, including the 1987 Grand Prix European Award naming him the Best Photographer in Europe, the 1989 World Press Award and the 1989 American Photography Award.

13.      Gamble is also a prolific artistic photographer, and has captured photographic portraits of some of the world's most famous people, including the Dalai Lama, Andy Warhol, Stephen Hawking and Margaret Thatcher.  One of his signature pieces is a series of photographs of Andy Warhol's New York apartment, shortly after the artist's death, to which he was given exclusive access by Sotheby's for a period of eight days.  He is known for leaving his photographs uncropped and untouched, capturing images that create a narrative of the subjects within their environments. This Andy Warhol photograph series led to an international exhibit tour and resulted in worldwide critical acclaim.

14.      His photographs can be found in major institutions, including the Andy Warhol Museum and the National Portrait Gallery, in London.  Gamble periodically issues limited edition

prints of his photographs – not exceeding 50 copies – which are offered for sale, and purchased, at prices ranging from $3,500 to $15,000 per copy for smaller and medium prints, and up to $20,000 for larger sized prints.  Every such print is signed by Gamble, dated and numbered as part of a limited edition work.  Museums, galleries, and individual collectors alike rely upon the scarcity of such works to maintain the exclusive value of such limited edition prints.

15.     Gamble has based a significant part of his entire livelihood on selling original works to museums, galleries and collectors.  He occasionally issues limited print editions of select works to supplement his income.

## 2)     _David Gamble and Curved Light Productions_

16.     On or about June 2005, Gamble first met Matsos, who at the time was working as the Executive Editor of _Astrobiology Magazine_, a NASA-sponsored online popular science magazine.  Upon information and belief, Matsos to date continues to serve as Executive Editor of _Astrobiology Magazine_, and is an employee of NASA.

17.     On or about April 2006, Matsos sent Gamble a podcast of an interview and/or conversation she had made with another scientist.  Matsos sent Gamble this podcast to get Gamble's feedback on whether the podcast could be developed into a radio or podcast show, as Gamble had extensive connections in the media and television/film industry.

18.     Upon review of the podcast, Gamble concluded that the content was not commercially appealing, geared exclusively to scientists or a very limited audience well versed in the field of science, and indicated the same to Matsos.  Gamble suggested to Matsos that instead, he and Matsos create a proper radio show, not just a podcast, and gear it towards an audience who may not have any scientific background, or even a college education.   In other words, create a

science show that would bring the subject matter to a broad ranging audience, in age and education levels, that may have, or perhaps never had, an interest in science.

19.     Gamble - a long time East Hampton, New York, resident- suggested to Matsos that Gamble reach out to one of his neighbors and friend who at the time was an executive at CBS Radio, Inc., a commercial broadcast radio network.

20.     In discussing this project, Gamble and Matsos came to an agreement that the radio show would be more appealing if it featured a charismatic host.

21.     On or about June 2006, Gamble and Matsos approached Tyson at an informal BBQ gathering on a beach near Tyson's residence, also in East Hampton, to gage his interest in this potential radio show, and the position of host.  Gamble and Matsos pitched him the show as an opportunity for Tyson to be himself, and reach out to an audience he may not otherwise have access to.  Tyson agreed to participate in the show.

22.     Gamble, Matsos and Tyson then began their collaboration in formulating the radio show that is today known as "StarTalk."

### 3)      *Creation of Curved Light Productions*

23.     In 2007, however, there was no StarTalk, nor were there any shows on air, let alone produced.  On the contrary, the parties had a long road before them prior to hitting airwaves.

24.     Gamble handled the administrative, legal and bookkeeping end of creating an entity for the purpose of the radio show.  The parties brainstormed on a potential name for the radio show, and after clearing several titles through legal counsel, ultimately settled on "StarTalk Radio."

25.     On or about March 2007, the parties formed Defendant Curved Light Productions LLC, with each contributing $10,000 for the purpose of producing the first pilot series.  Gamble brought in his own personal accountant and lawyer, and retained a bookkeeper.

26.     On or about March 2007, Gamble, Matsos and Tyson each owned an equal share in Curved Light Productions LLC.

27.     On or about June 2008, Gamble and Matsos pitched the idea of the radio show to Gamble's contact David Goodman ("Goodman"), the then President of Marketing at CBS Radio, Inc. ("CBS").  As a result of this meeting, and Gamble's connections, the parties were granted access to CBS' studios to record the show.  Goodman suggested that the parties include a comedian as a co-host; all three parties – Gamble, Matsos and Tyson – agreed that this was a good idea.

28.     Gamble was friends with Lynne Koplitz, an established stand-up comedian and actress, as well as a regular on Comedy Central, who at the time was co-starring with Joan Rivers on a television show.  Gamble reached out to Lynne Koplitz and she agreed to co-host StarTalk alongside Tyson.

### 4)     *StartTalk Production*

29.     On or about June 2008, CLP produced a series of pilot podcasts in CBS's studios.

30.     Shortly thereafter, CLP applied for a National Science Foundation grant on behalf of CLP.  On or about September 2009, CLP was awarded a grant of $250,000 by the National Science Foundation for the purpose of producing 13 shows and putting them on the air.  As a result of Gamble's efforts and connections, CLP was able to produce the shows at CBS's studios, and broadcast the same on CBS's stations.

31.     On or about September 2009, Gamble, on behalf of CLP, applied for a second grant from the National Science Foundation.

32.     Gamble was listed as a co-principal and co-producer on both grant applications.

33.     On or about September 2009, CLP was awarded a grant of approximately $1,500,000 for the purpose of producing additional radio shows.  The funds were used for production of the shows, including radio time, talent, comedians, and post-productions.  These shows were ultimately broadcast on air starting from on or about December 2010.  Through Gamble's efforts, CLP was able to re-use CBS's studios, and Gamble, again, was able to successfully broker broadcasting deals for the shows for distribution on CBS's stations as well as Clear Channel Communications, Inc.'s stations across the country.

34.     Gamble, Matsos and Tyson each received a producer's fee, per show produced, for their work at CLP.

35.     Throughout this time, Gamble handled all aspects of production, including but not limited to the selection and hiring of talent, confirming bookings, ensuring all payments were made to the appropriate parties, dealing with accountants and legal counsel, and coordinating with the production studios to ensure the radio shows were produced in a timely manner and within budget.


### 7)     *Gamble's Photograph of Tyson*

36.     On or about September 2008, Tyson agreed to have Gamble take his portrait.  Gamble was working on a portrait book, and offered to take Tyson's picture and include it in the portrait book.  At the time, Tyson was coming out with a new book, *The Pluto Files*, and Tyson's publisher was looking for a possible portrait, or design, for the book cover.

37.     Gamble had previously taken the portrait of Stephen Hawking for Hawkins' book cover, *A Brief History of Time*, a best seller published in 1989 that sold more than 10 million copies in the span of 20 years.  Tyson agreed to have Gamble take his picture in the hope it might be used

to promote Tyson's own upcoming book.  The resulting photograph was a strikingly personal portrait providing a glimpse into Tyson's daily routine and work as an astrophysicist and educator (the "<u>Tyson Portrait</u>").  <u>See</u> Exhibit A (Copyright Registration for the Tyson Portrait).

38.     The Tyson Portrait proved to be useful to Tyson precisely for that purpose – to wit, to promote his media appearances and discussion of science in an educational and accessible context.

39.     On or about November 2008, Gamble entered into a license agreement with Norton Publishing, allowing the publisher to use Gamble's portrait of Tyson for the *Pluto Files*.

40.     Gamble also orally granted Tyson the right to use a small electronic file of the Tyson Portrait for the limited purpose of Tyson's use to identify himself as a director on the Hayden Planetarium website.  This permission was given on the condition that Tyson would include Gamble's contact information with email and telephone number, along with a statement that any use of the Tyson Portrait would necessitate Gamble's express permission through a license agreement.

### 5)     *Gamble's Illness*

41.     On or about August 2011, Gamble's health took a turn for the worse.  Gamble was battling polycystic kidney disease, a rare genetic affliction that affects one in 1,000 Americans. On or about September 2011, Gamble entered final stage kidney failure.  As a result of this, Gamble kidney function was lethally low and Gamble had to undergo dialysis treatment for 3 to 4 hours per day.

42.     Throughout this time, however, Gamble remained an active participant in CLP, and in fact, continued his duties without interruption, despite the enormously draining medical challenges he was facing. In fact, Gamble was spending more of his time dealing with StartTalk's

production work, to the detriment of his photography work, which had previously been his main source of income.

### 6)      *Gamble's Systematic Exclusion from CLP*

43.      Starting from on or about September 2011, and coinciding with the onset of Gamble's deteriorating health, Matsos and Tyson began systematically excluding Gamble from decision making at CLP.   Rather than confer with Gamble on fundamental issues such as production work, creative direction, and the allocation of profits, Matsos and Tyson ceased communicating with Gamble.   To make matters worse, upon information and belief, Tyson specifically instructed CLP's accountant and bookkeeper – the very same individuals Gamble had hired - to cease all communications with Gamble.

44.      Upon information and belief, on or about September 2012, Tyson and Matsos applied for a third National Science Foundation grant.

45.      Neither Matsos, nor Tyson, ever provided Gamble information pertaining to that grant, including but not limited to, information relating to CLP's proposed budget for that grant.

46.      Gamble found out about the grant application when an Investigations Scientist from the National Science Foundation assigned to CLP contacted CLP requesting supporting documents for the previous grant provided to CLP.   It is also when Gamble learned that he had been surreptitiously excluded from this third grant application as a producer, and that his fee and contribution as a producer, had been completely eliminated from CLP's budget.

47.      On or about August 2012, Matsos and Tyson approached Gamble and informed him that he was spending too much time on dialysis and that, as a result, he should cease receiving his customary production fee – Gamble's sole source of income at the time – and instead, receive a monthly consultant fee of $1,000, for a term of one year only – subject to renewal only upon

mutual consent of the parties.  By majority vote, the members of CLP reduced his income, which previously averaged $4,500 per month, to $1,000 per month.  Upon information and belief, no such reduction in income was ever entertained by CLP members for Matsos or Tyson's CLP distributions as a result of their outside professional interests at the Hayden Planetarium and NASA.

48.     The CLP Operating Agreement that the parties executed did not require that LLC members devote their full time or any specific amount of time to the business of the LLC. Furthermore, the CLP Operating Agreement expressly authorized LLC members to engage in business ventures and investments, other than in connection with CLP, of any nature whatsoever, as long as such venture was not competitive with the business of CLP.

49.     On or about September 2012, facing no other options, Gamble decided to try selling his equity interest in CLP as his income had been effectively reduced to $1000 per month by majority decision of the remaining members, rendering it impossible for him to sustain himself, and cover his mounting medical bills – particularly given the agreement's expiration date of one year.

50.     In accordance with the CLP Operating Agreement, on or about November 2012, Gamble offered his membership interest for sale to CLP, Tyson and Matsos.  Neither CLP, Tyson nor Matsos expressed an interest in purchasing Gamble's equity interest in CLP.

51.     On or about November 2012, Tyson told Gamble that his equity interest would be worth no more than $350,000 based upon Tyson's review of CLP's assets and income for 2012.

52.     On or about August 2013, Gamble found a third party interested in purchasing his membership interest for $350,000.

53. In accordance with the CLP Operating Agreement, Gamble communicated this third party's interest to Matsos and Tyson, and offered the same purchase terms to CLP, Matsos and Tyson.

54. On or about October 2013, Gamble, Matsos, and Tyson entered into a Membership Interest Purchase Agreement in the amount of $350,000.

55. The Membership Interest Purchase Agreement provided that payment was to be made in several parts, with a combination of fixed periodic cash payments, and additional contingent payments consisting of a percentage of CLP's profits, a production fee, and referral fee payments to be made based upon pending StartTalk projects that were brokered through Gamble's efforts. For the exception of contingent payments based upon CLP's profits, all payments were capped at $350,000 and any obligation to pay Gamble terminated in its entirety on December 31, 2016.

56. It did not take long for CLP to default on its payment and reporting obligations to Gamble. At the time, however, Gamble's health had deteriorated to such an extent that he was neither physically nor financially able to address CLP's default.

**8)** ***Gamble's Remission and Discovery of Copyright Infringement***

57. On or about January 2014, Gamble received a kidney transplant. After months of slow remission, Gamble began assembling together the fragments of his life that his illness had painfully shattered into pieces.

58. Gamble focused his attention on his photography work, and earning an income from revenues generated through picture sales. As is customary practice for established photographers such as Gamble, all pictures taken by Gamble were also candidates for photo syndication – this is how photographers earn an income. Since the 1990s, Gamble had agreements in place with some

of the most established and famous photo syndication agencies, including but not limited to Sygma Paris, Corbis, Top Foto UK and Getty Images.

59.     After regaining his health, Gamble confronted Tyson and Matsos regarding their default on the Purchase Agreement.  Tyson and Matsos had failed to report and pay monies due to Gamble pursuant to the Purchase Agreement, despite Gamble's repeated requests.

60.     In an effort to "settle" the continuing dispute, on or about March 2015, the parties entered into an Amended Membership Interest Purchase Agreement ("Amended Agreement"). The Amended Agreement reworked the timing of Gamble's receipt of cash payments, and eliminated net profit payments owed to him, while maintaining the cap of $350,000 on the remaining contingent payments and the termination deadline of December 31, 2016.  In other words, the Amended Agreement *reduced* Gamble's potential for earning contingent payments from CLP, and merely re-allocated the timing of Gamble's cash payments, so that cash payments that would be otherwise due to Gamble over a longer period of time in the original agreement, would now be received earlier.

61.     Gamble agreed to this Amended Agreement as Tyson had informed him that Tyson would likely be leaving StarTalk and that he did not believe the show had any future.  Tyson encouraged Gamble to agree to the revised terms, explaining that Gamble should just take the "money while it's there" because it was likely CLP may simply shut down and contingent payments would not be forthcoming.

62.     Several months after executing the Amended Agreement, however, Gamble found out through a press a release that CLP had signed a television deal with National Geographic for the StarTalk show featuring Tyson.  Neither Tyson, nor Matsos had disclosed to Gamble the fact that CLP had entered into, or was contemplating entering into such a television deal.

63.    On or about December of 2015, Tyson and Gamble met in New Orleans, Louisiana, to mend fences.  Tyson at the time was on a speaking tour and had just held a show in Gamble's new hometown of New Orleans.

64.    During the meeting, Tyson divulged to Gamble that a Northeast presenter had decided to use the Tyson Portrait for a poster.

65.    At the time, Gamble attributed the statement to Tyson's boasting, rather than an accurate statement.  This is because Gamble had never provided to Tyson a large enough electronic file of the Tyson Portrait for it to be replicated into a large print.

66.    Subsequent to the meeting, Gamble contacted Tyson's public relations management company to inquire as to whether Tyson had provided them an electronic file of the Tyson Portrait for dissemination, or whether they had any knowledge of presenters using the Tyson Portrait for large posters.  Despite his direct request, Tyson's public relation agency did not admit to using such a file, and was dismissive of Gamble's request – neither providing an image of the poster in question, nor revealing (as Gamble subsequently found out) that it was actually a highway billboard.  Since Gamble had never provided Tyson with a large file, Gamble did not pursue the matter further.

67.    After the December 31, 2016 deadline for payment pursuant to the Amended Agreement passed, there remained approximately $150,000 still owed to Gamble to reach the $350,000 cap relating to the sale of his membership interest.

68.    In light of Defendants' failure to provide any contingent payment, or report on any monies due to Gamble, Gamble started investigating CLP to determine whether CLP was in such dire financial standing, as Tyson had previously represented to him.

14

69.     Gamble also started investigating the use of the Tyson Portrait, as well as the use of any other pictures Gamble had taken while at CLP.

70.     What he discovered was astounding both in its scale and brazenness.

71.     While a member of CLP, Gamble had periodically taken pictures of CLP guests and other events at CLP.

72.     As CLP had no budget for photography, Gamble was taking photographs for Gamble's own use and syndication purposes – which as a photographer, was a source of income for him.

73.     It was also understood between the parties that Gamble was not CLP's photographer, nor did he ever act in that capacity while a member of CLP.  On the contrary, he was a principal of CLP and producer of StarTalk, and had always acted as such throughout his time at CLP.

74.     Unbeknownst to Gamble, CLP had placed a number of these pictures that Gamble had taken while a member at CLP, including the Tyson Portrait, on the StartTalk website, and throughout StartTalk's social media channels.  This included multi-image banners, media galleries and other related postings.

75.     Upon information and belief, Tyson and Matsos had retained such picture files in CLP's joint Dropbox account.

76.     These infringing uses were not limited to CLP.  On the contrary, Tyson, in promoting StarTalk and his own media appearance, had used the Tyson Portrait in various formats, well exceeding the limited resolution of a small thumbnail picture.

77.     Upon information and belief, Tyson had obtained a high resolution file from Norton Publishing, since Gamble had never provided such a file to Tyson or anyone else at CLP.

78.     To make matters worse, it appeared Tyson had used the Tyson Portrait for purposes of promoting his media appearances throughout the country on shows such as *An Evening with Neil DeGrasse Tyson* and *Neil deGrasse Tyson Live!*  This includes large scale posters promoting Tyson's shows, and, incredibly, highway billboards.

79.     Upon information and belief, Tyson was using the Tyson Portrait to promote most, if not all, of his media appearances.

80.     Upon confronting Tyson, Gamble was horrified to discover that this use was merely the tip of the iceberg.  Tyson confessed to Gamble that, starting from April 2015, Tyson had used the Tyson Portrait, and created approximately 1541 hard copy prints of the picture – a use which he described as "limited prints."  To those "limited prints," Tyson affixed his signature on each print and sent out the "limited print" to certain donors who qualified for the reward as a result of their financial support of the StarTalk show.

81.     At no point prior to, during, or after Gamble's ownership of an equity interest in CLP did Gamble license, or assign ownership of the copyright in these pictures to CLP, Tyson or Matsos.

82.     At no point prior to, during, or after Gamble's ownership of an equity interest in CLP did Gamble license, or assign ownership of the copyright in the Tyson Portrait to CLP, Tyson or Matsos.

83.     At no point prior to, during, or after Gamble's ownership of an equity interest in CLP did Gamble receive any monies for taking photographs at CLP.

84.     For the exception of the limited license agreement with Norton Publishing and Tyson's use of a small electronic file for the Hayden Planetarium website, Gamble never entered

into any other license agreements, nor was Gamble ever offered any compensation, for any of these infringing uses of the Tyson Portrait.

## FIRST CAUSE OF ACTION
As against Tyson, CLP, and John Does 1-10
(Copyright Infringement)

85.     Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

86.     Plaintiff is the sole owner of all rights, title and interest in the Tyson Portrait – a work registered with the Copyright Office.

87.     Plaintiff did not license, assign, nor transfer any interest in the Tyson Portrait to CLP, Matsos or Tyson.

88.     Defendants used the Tyson Portrait to promote CLP, StarTalk and Tyson's media appearances throughout social media, by forwarding it to presenters, and on the CLP website.

89.     Defendant Tyson either directly used, or personally directed CLP staff and independent contractors to use the Tyson Portrait to promote StarTalk.

90.     Defendant Matsos directly used, or personally directly CLP staff and independent contractors to use the Tyson Portrait to promote StarTalk.

91.     Tyson personally directed his management agency, and other third parties, including various presenters, to use the Tyson Portrait to promote his various media appearances.

92.     CLP used the Tyson Portrait on StarTalk's website and throughout its various social media platforms.

93.     CLP used the Tyson Portrait by distributing hard copy prints of the Tyson Portrait to its donors.

94.     Upon information and belief, John Does 1-10 are third party presenters to whom CLP and/or Tyson forwarded the Tyson Portrait who are directly infringing or at a minimum are facilitating and aiding these infringements, and John Does 1-10 are contributing to copyright infringements and are thus both directly and vicariously liable for copyright infringement.

95.     Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and with indifference to Plaintiff's rights.

96.     As a direct and proximate result of said infringement by Defendant, Plaintiff is entitled to damages in an amount to be proven at trial, including actual damages and profits, and statutory damages pursuant to 17 U.S.C. §504.

## SECOND CAUSE OF ACTION
Tyson and John Does 1-10
(Contributory Copyright Infringement)

97.     Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

98.     Defendants used the Tyson Portrait to promote CLP, StarTalk and Tyson's media appearances throughout the country and forwarded the same to various presenters ("Third Party Presenters").

99.     Upon information and belief, Tyson obtained a high resolution file of the Tyson Portrait from his publisher, Norton Publishing.

100.    These Third Party Presenters used the Tyson Portrait, without obtaining a license from Gamble, to promote Tyson's speaking events throughout the country.

101.    Gamble did not give a license to either Tyson, an agent of Tyson, or Norton Publishing to use the Tyson Portrait to promote Tyson's events throughout the country.

102.   Tyson knew that he did not have a license from Gamble to use the Tyson Portrait in such a manner, and knew that these Third Party Presenters were using the Tyson Portrait.

103.   Tyson materially contributed to such an infringement because he specifically sought a high resolution file from Norton Publishing in order to forward to such Third Party Presenters, and then forwarded the same to such Third Party Presenters.

104.   Upon information and belief, John Does 1-10 are such Third Party Presenters to whom CLP and/or Tyson forwarded the Tyson Portrait who are directly infringing or at a minimum are facilitating and aiding these infringements, and John Does 1-10 are contributing to copyright infringements and are thus both directly and vicariously liable for copyright infringement.

105.   As a direct and proximate result of said infringement by Defendant, Plaintiff is entitled to damages in an amount to be proven at trial, including actual damages and profits, and statutory damages pursuant to 17 U.S.C. §504.

**THIRD CAUSE OF ACTION**
Tyson and John Does 1-10
(Vicarious Copyright Infringement)

106.   Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

107.   Defendants used the Tyson Portrait to promote CLP, StarTalk and Tyson's media appearances throughout the country and forwarded the same to various presenters ("Third Party Presenters").

108.   Upon information and belief, Tyson obtained a high resolution file of the Tyson Portrait from his publisher, Norton Publishing.

109.   These Third Party Presenters used the Tyson Portrait, without obtaining a license from Gamble, to promote Tyson's speaking events throughout the country.

110.     Gamble did not give a license to either Tyson, an agent of Tyson, or Norton Publishing to use the Tyson Portrait to promote Tyson's events throughout the country.

111.     Tyson knew that he did not have a license from Gamble to use the Tyson Portrait in such a manner, and knew that these Third Party Presenters were using the Tyson Portrait.

112.     Tyson at all times had the ability to supervise such Third Party Presenter's use of Tyson's images, since Tyson, or his agents, are the sole parties that could provide his own media press kit to such Third Party Presenters.

113.     Tyson directly benefitted from such promotions as the Tyson Portrait facilitated ticket sales and aided in making such events more attractive to the public.

114.     Upon information and belief, John Does 1-10 are such Third Party Presenters to whom CLP and/or Tyson forwarded the Tyson Portrait who are directly infringing or at a minimum are facilitating and aiding these infringements, and John Does 1-10 are contributing to copyright infringements and are thus both directly and vicariously liable for copyright infringement.

115.     As a direct and proximate result of said infringement by Defendant, Plaintiff is entitled to damages in an amount to be proven at trial, including actual damages and profits, and statutory damages pursuant to 17 U.S.C. §504.


**FOURTH CAUSE OF ACTION**
(Removal of Copyright Management Information)

116.     Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

117.     Defendants infringed upon Plaintiff's rights by intentionally omitting and/or removing the name of, and other identifying information about, the Plaintiff  from the infringing works in violation of 17 U.S.C. § 1202(b)(1).

118.    Defendant intentionally distributed, or caused others to distribute, copies of the infringing works by providing the high resolution file of the Tyson Portrait, knowing, or having reasonable grounds to know, that copyright management information had been removed or altered without authority of the Plaintiff.  A a result of the foregoing, Defendants deliberately created a secondary market of sale and potential sale to collectors of the signed prints.

119.    As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
Tyson
(Fraudulent Concealment by a Fiduciary)

120.    Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

121.    Defendant Tyson owed a fiduciary duty to Gamble as Defendant Tyson and Plaintiff were both members of CLP, and Defendant Tyson had a duty to fully and accurately account to Plaintiff the financial standing of CLP and any net profits earned or to be earned by CLP.

122.    In renegotiating an Amended Agreement due to Defendants' default, Defendant Tyson owed the same fiduciary duty to Plaintiff as Defendant had when the parties entered into the initial Membership Purchase Agreement.

123.    Defendant Tyson purposefully concealed from Gamble the fact that CLP had entered into a television deal with National Geographic in order to negotiate a lower payout to Plaintiff for his membership interest.

124.     At the time Tyson represented to Gamble that the financial standing of StarTalk was in jeopardy, Tyson knew that was not the case, and that CLP had negotiated a lucrative television deal with a major television network.

125.     Gamble reasonably relied upon Tyson's misrepresentation as Tyson was uniquely positioned to understand the extent and scope of CLP's financial standing.  Gamble would not have agreed to the terms of the Amended Agreement if Tyson had not made such misrepresentation.

126.     As a result of Tyson's misrepresentation, Gamble agreed to forego contingent net profit payments that had previously been negotiated into the original Membership Interest Purchase Agreement.

127.     As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
Tyson
(Fraud and Deceit)

128.     Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

129.     Defendant Tyson purposefully concealed from Gamble the fact that CLP had entered into a television deal with National Geographic in order to negotiate a lower payout to Plaintiff for his membership interest.

130.     At the time Tyson represented to Gamble that the financial standing of StarTalk was in jeopardy, Tyson knew that was not the case, and that CLP had negotiated a lucrative television deal with a major television network.  Tyson made that statements with the intent to induce Plaintiff's reliance upon it.

22

131.    Gamble reasonably relied upon Tyson's misrepresentation as Tyson was uniquely positioned to understand the extent and scope of CLP's financial standing.

132.    As a result of Tyson's misrepresentation, Gamble agreed to forego contingent net profit payments that had previously been negotiated into the original Membership Interest Purchase Agreement.

133.    As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial.

<strong><u>SEVENTH CAUSE OF ACTION</u></strong><br>Tyson and Matsos<br>(Breach of Contract)

134.    Plaintiff repeats and realleges all allegations in the complaint as if set forth at length herein.

135.    Plaintiff and Defendants entered into a Membership Interest Purchase Agreement pursuant to which Defendants were to make certain payments in exchange for Plaintiff's membership interest.

136.    Defendants subsequently defaulted on their payment obligations to Plaintiff by failing to report monies earned by CLP, and failing to remit payments due to Plaintiff pursuant to such agreement.

137.    To purportedly remedy such default, the parties entered into an Amended Agreement which effectively reduced the monies due to Plaintiff for Plaintiff's membership interest, and merely re-allocated the timing of payments due to Plaintiff.

138.    The Amended Membership Interest Purchase Agreement is invalid for lack of consideration.

23

139.     Defendants remain in default for Defendants' breach of the original Membership Interest Purchase Agreement, to include any contingent payments owed to Plaintiff pursuant to such referenced agreement.

140.     As a result of Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays that the Court grant the following relief and enter Judgment as follows:

(1) On the FIRST CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(2) On the SECOND CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(3) On the THIRD CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(4) On the FOURTH CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(5) On the FIFTH CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(6) On the SIXTH CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(7) On the SEVENTH CAUSE OF ACTION, awarding damages in an amount to be determined at trial;

(8) As to all Requests for Relief/Causes of Action, awarding Plaintiff her attorneys' fees and costs; and

(9) Granting such other and further relief as the Court may deem just and proper.

Dated:  August 31, 2017
        New York, New York

Respectfully submitted,

By: Olivera Medenica
**MEDENICA LAW PLLC**
*Attorneys for Plaintiff*
3 Columbus Circle, 15th Floor
New York, New York 10019
Tel: (212) 785-0070

25